IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

CANDLEHOUSE, INC.,

                              Plaintiff,          Civil Action No.
                                                  3:11-CV-0093 (DEP)

    v.

TOWN OF VESTAL, NEW YORK,

                              Defendant.

_____

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF:

AMERICAN CENTER FOR LAW AND           ABIGAIL SOUTHERLAND, ESQ.
JUSTICE                               LARRY L. CRAIN, ESQ.
5214 Maryland Way, Suite 402          CARLY F. GAMMILL, ESQ.
Brentwood, TN 37027                   DAVID A. FRENCH, ESQ.

HINMAN, HOWARD & KATELL, LLP          DAWN J. LANOUETTE, ESQ.
P.O. Box 5250                         SARAH G. CAMPBELL, ESQ.
80 Exchange Street
700 Security Mutual Building
Binghamton, NY 13902-5250

FOR DEFENDANT:

AHMUTY, DEMERS & McMANUS              ROBERT J. HINDMAN, ESQ.
750 Roanoke Avenue                    AGNIESZKA A. WILEWICZ, ESQ.
Riverhead, NY 11901                   DAVID S. BERGER, ESQ.

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>DECISION AND ORDER</u>

Plaintiff Candlehouse, Inc. ("Candlehouse"), the owner of residentially zoned property located in the Town of Vestal, New York ("Town"), has commenced this action against the Town based upon the refusal of the its Code Enforcement Officer and Zoning Board of Appeals to find that plaintiff's anticipated use of the property, as a Christian faith-based residential treatment facility for young women struggling with addiction or emotional disorders, is a permitted use of the property under the Town's zoning ordinances.[1]  In its complaint, Candlehouse asserts that the Town's refusal to allow its intended use of the property violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and the Fair Housing Act ("FHA"), 42 U.S.C. § 3601.  Plaintiff also alleges that the Town's restriction on its use of the premises constitutes an unlawful burden on its residents' religious exercise, in violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc(a).

Currently pending before the court are the parties' cross motions for summary judgment.  In addition, plaintiff has applied for the issuance of

---

[1]      This action is before me based upon consent of the parties, pursuant to 28 U.S.C. § 636(c).  Dkt. No. 20.

sanctions based upon defendant's alleged destruction of or failure to produce relevant evidence, and to strike the report of defendant's retained expert and preclude her from testifying at trial. For the reasons set forth below, I conclude that the defendant is entitled to the entry of summary judgment dismissing plaintiff's disparate impact claim under the ADA and the FHA, and its RLUIPA cause of action, but that the existence of material disputes of fact preclude the entry of summary judgment in either party's favor with regard to plaintiff's intentional discrimination and reasonable accommodation claims under the ADA and FHA. In addition, I conclude that plaintiff's application for the issuance of sanctions is not yet ripe for determination, and that defendant's expert is precluded from testifying at trial with regard to several of the conclusions included in her report.

I.     BACKGROUND

Plaintiff, which operates as Candlehouse Teen Challenge, is a Christian non-profit organization whose avowed function is "to restore individuals who struggle with life controlling problems such as alcohol abuse and/or who struggle with emotional disorders." Dkt. No. 70 at ¶ 3. According to its mission statement, Candlehouse's purpose is to permit its

residents "to live life together with freedom, peace and joy."  Dkt. No. 70-2 at 1.  Candlehouse is one of 234 accredited Teen Challenge programs operating nationwide, utilizing a program pioneered in 1958 by Rev. David Wilkerson.  Dkt. No. 68-2 at ¶¶ 3,5.  Candlehouse has operated as a Teen Challenge-affiliated residential center in New York for more than seventeen years, and for eight years prior to that as a non-affiliated center, assisting women to recover from the negative impacts of substance abuse and emotional disabilities.  Dkt. No. 70 at ¶ 5.  While students eligible for participation in the Candlehouse program who struggle with substance abuse are no longer chemically dependent, "they have demonstrated an inability to live independently and abstain from addiction in the long-term and/or live without support as a result of an emotional disability or illness."  *Id.* at ¶ 12.

Students who enroll in the program typically reside at a Candlehouse facility between twelve and thirty-six months, depending upon their needs.  Dkt. No. 70 at ¶ 9.  During their stay, the students live in a family-like environment, in which they experience a daily regimen of activities that include Bible study, life skills classes, work assignments, community projects, religious worship, and free time.  *Id.* at ¶¶ 10, 15.

4

The goal of the Candlehouse program is to restore students suffering from the disabling affects of addiction or mental health issues to a point where they are capable of living independently, finding and maintaining employment, mending relationships with family members, and caring for themselves. *Id.* at ¶ 7.

Students enrolled in the Candlehouse program live, sleep, cook and eat together, and spend much of their days interacting with other students. Dkt. No. 70 at ¶ 17. The operators of Candlehouse prefer to locate the program's facilities in residential neighborhoods. *Id.* at ¶ 18. According to Candlehouse's director, Richard Mecklenborg, being situated in a residential neighborhood allows participating students to go outdoors, and motivates them to abstain from drug or alcohol abuse. *Id.* at ¶¶ 19, 20.

In or about September 2008, Candlehouse purchased from the Episcopal Diocese of Syracuse two properties located at 400 Mirador Drive and 401 Mirador Drive, Vestal, New York ("Mirador property"). For the last fifty years, the Mirador property had been utilized as a church and accompanying church campus. Dkt. No. 70 at ¶ 24. Candlehouse's intent in acquiring the Mirador property was to combine its residential campus and work training programs with the religious component of the Teen

Challenge programs, which includes Bible study and other classes.  *Id.* at

¶ 22.  It was contemplated that the residential program would support up

to twelve students, plus two staff employees and a housemother.  *Id.* at ¶

25.

The Mirador property is located in a portion of the Town of Vestal

designated as RA-1 residential district for zoning purposes.  Dkt. No. 61 at

¶ 12.  In pertinent part, Article IV, Section 25-151 of the Town's Zoning

Code permits the following uses for such properties:

> Boarding and/or rooming house providing
> accommodations, for not more than two (2) transient
> roomers, provided that off-street parking
> requirements can be met . . .
>
> Church and other place of worship, including Sunday
> school building and rectory, provided said lot has a
> minimum frontage of one hundred fifty (150) feet, a
> minimum depth of one hundred fifty (150) feet, and
> contains a minimum of twenty-two thousand five
> hundred (22,500) square feet . . .
>
> Cultivation of plants and plantings when conducted
> by the occupants of the premises and incidental to
> the principal use . . .
>
> One-family detached dwelling . . .
>
> One-family detached modular home . . .
>
> Park, playground and other open recreational area
> when operated by the town . . .

> Public elementary or secondary school; parochial
> school . . .
>
> Temporary structure incidental to the development of
> land or to the erection of a permanent structure[.]

Dkt. No. 60-1 at 10.  That same provision prohibits, *inter alia*, the following

uses in RA-1 residential districts:

> Boarding house or rooming house . . .
>
> Boarding and/or rooming house providing
> accommodations for not more than four (4)
> nontransient roomers and provided that off-street
> parking requirements are met . . .
>
> Eleemosynary institution . . .
>
> Multiple family dwelling . . .
>
> Nursing or convalescent home or sanitarium . . .
>
> Two-family dwelling or modular home[.]

*Id.*

On September 23, 2008, Mecklenborg approached Mark Dedrick,

the Town's Code Enforcement Officer ("CEO"), to discuss Candlehouse's

interest in the Mirador property, and inquire as to whether it would be

permitted to use the property as a church and residence for its students in

light of the fact that the property is zoned as RA-1 residential.  Dkt. No.

7

70-1.  The next day, Mecklenborg sent a letter to Dedrick indicating that the proposed use of the property was "to continue to use it as a church," and that Candlehouse's "regular services . . . offer women a temporary residence with counseling."  Dkt. No. 70-1.  In response, Dedrick wrote Mecklenborg a letter dated September 30, 2008, requesting additional information and advising Mecklenborg that temporary housing is not permitted in an RA-1 zoned district.  Dkt. No. 61-2 at 2.

On October 12, 2008, Mecklenborg again wrote a letter to Dedrick providing the requested details concerning Candlehouse's proposed use of the Mirador property.  Dkt. No. 61-3 at 2.  More specifically, Mecklenborg explained that "temporary residents" could be anticipated to stay an average of thirteen months, and live together with three or more assigned to each bedroom.  *Id.* at 2, 5.

On December 17, 2008, the Vestal Town Board discussed the proposed use of the Mirador property by Candlehouse during a public meeting.  Dkt. No. 69-7.  In that meeting, the Town's attorney stated that Candlehouse's proposed dormitory living quarters would be inconsistent with the RA-1 zoning regulation.  *Id.* at 3.  Following that meeting, residents in the neighborhood surrounding the Mirador property began to

voice their concerns over Candlehouse's proposed use.  Dkt. No. 70 at ¶ 28; Dkt. No. 70-3.  In an effort to assuage those concerns, Candlehouse held a neighborhood meeting on December 22, 2008, for the purpose of providing attendees with information concerning the contemplated use.  Dkt. No. 70 at ¶ 29; Dkt. No. 70 Exh. E (traditionally filed, not electronically filed).  At that meeting, both supporters and opponents to the proposed use spoke, although there was significantly more opposition than support voiced for the program.  Dkt. No. 70 Exh. E (traditionally filed, not electronically filed).  Four members of the Vestal Town Board attended that neighborhood meeting.  Dkt. No. 69-3 at 5.

The topic of Candlehouse's plans for the Mirador property arose again during a Vestal Town Board meeting, held on January 14, 2009.  Dkt. No. 69-8.  At that meeting, five Town residents spoke out against the proposed use.  *Id.*

On January 21, 2009, Sara G. Campbell, Esq., an attorney for Candlehouse, wrote to CEO Dedrick, stating that her client proposed to use the Mirador property as a church and rectory only, defining rectory as "a residence for church personnel."  Dkt. No. 61-4 at 2.  By letter dated February 5, 2009, Dedrick responded to Attorney Campbell by indicating

that, while use as a church was consistent with the property's RA-1 residential district zoning, the proposed use as a residence with twenty-four hour, supervised, community-living accommodations and parental-style leadership for students, did not qualify as a rectory. Dkt. No. 61-5.

On February 6, 2009, Attorney Campbell again wrote to Dedrick, claiming that Candlehouse's proposed use of the Mirador property constituted a "family/functional equivalent of a family under the Town of Vestal Code."[2] Dkt. No. 69-2.

_____

[2]     Section 24-1 of the Town's zoning code defines "family" as follows:

*Family* means:

(1)     Any number of persons occupying a single dwelling single dwelling unit, related by blood, marriage or legal adoption, living and cooking together as a single housekeeping unit.

(2)     Any number of persons occupying a single dwelling unit, not exceeding five (5) adults living and cooking together as a single housekeeping unit where all were not related by blood, marriage or legal adoption.

(3)     Notwithstanding the provisions of subsection (2) of this definition, a group of unrelated persons numbering more than five (5) shall be considered a "family["]: upon a determination by the zoning board of appeals that the group is the functional equivalent of a family pursuant to the standards enumerated in subsection (1) herein. Thia presumption may be rebutted and the non-related individuals may be considered the functional equivalent of a "family" for the purposes of this article by the zoning board of appeals if such group of individuals exhibits one (1) or more characteristics consistent with

the purposes of zoning restrictions in residential districts.

(4)     In determining whether a group of more than five (5) unrelated persons constitutes a "family" for the purpose of occupying a dwelling unit, as provided for in subsection (3) of this definition, the zoning board of appeals shall utilize the standards enumerated in subsection (1) in making said determination. Before making a determination under this subsection, the zoning board of appeals shall hold a public hearing, after public notice.  Said application shall be on a form provided by the zoning board of appeals accompanied by the required fee.

(5)     In making a determination under subsection (4), the zoning board of appeals shall find that:

a.     The group is one which in theory, size, appearance and structure resembles a traditional "family" unit.

b.     The group is one which will live and cook together as a single housekeeping unit.

c.     The group is of a permanent nature and is neither a framework for transient or seasonal living nor merely an association or relationship which is transient.

d.     In no case shall a dwelling be occupied by more than two (2) adults to a conventional bedroom.

e.     All other requirements of this local law regarding the use and occupancy of dwelling units shall be complied with.

f.     Any determination under this subsection shall be limited to the status of a particular group as a family and shall not he interpreted as authorizing any other use, occupancy or activity.

g.     In making any such determination, the board of

Dedrick responded by letter dated February 11, 2009, explaining that how, in his view, Candlehouse's proposed use does not comport with any of the seven definitional paragraphs provided for in the Town's zoning Code related to family. Dkt. No. 61-7. He concluded by stating that "the definition within the context of the Code of the Town of Vestal does not allow me to affirm that the Candlehouse use, as presented in written and oral information meets the criterial of a family." *Id.* at 3.

On March 25, 2010, the Town's Zoning Board of Appeals ("ZBA") entertained an appeal by Candlehouse concerning its proposed use of the Mirador property.[3] Dkt. No. 78-4. During the ZBA hearing, Candlehouse

---

appeals may impose such conditions and safeguards as the board of appeals shall deem necessary or advisable in order to maintain the stability and character of the neighborhood and protect the public health, safety and welfare, including but not limited to ingress, egress. lighting, off-street parking and screening.

(6)  Persons occupying group quarters such as a dormitory, fraternity or sorority house or a seminary shall not·be considered a "family".

(7)  Occupancy by two (2) or more illegal aliens shall be prescriptive evidence of a violation at this section.

Dkt. No. 60-1 at 7-8.

[3]    The ZBA is comprised of appointed members who receive no compensation for their service; its function is to decide appeals from, and review decisions of, the Town's administrative officials related to zoning. Dkt. No. 60 at ¶ 8.

representatives made a presentation concerning their proposed use of the Mirador property and were questioned by ZBA members regarding Candlehouse's program. Dkt. No. 78-4 at 5-53. Time was then allotted for public comments, of which there were many. *Id.* at 55-70. Following that hearing, the ZBA issued a decision, dated May 10, 2010, unanimously concluding that Candlehouse does not meet the definition of the functional equivalent of a family, and setting out the reasoning for the its determination. Dkt. No. 70-5. In its decision, the ZBA considered and applied the attributes of a family as set out in the governing ordinance, concluding that (1) the proposed assembly of students does not resemble a traditional family unit; (2) it is anticipated that the group will live and cook together as a single housekeeping unit; (3) Candlehouse students are anticipated to be transient in nature, rather than permanent, entering and leaving as they are either rehabilitated or expelled; and (4) the proposed bedroom would not be a "conventional" bedroom but instead would contain rows of bunks for all students in one large room. *Id.* at 5-6.

On May 5, 2010, through counsel, Candlehouse argued to the Town Board that its program is protected by the FHA and ADA, and formally requested that the Town make a reasonable accommodation to its zoning

rules and policies in the form of either a waiver of the family requirement, or, alternatively, an amendment of the Town's zoning ordinance to permit the desired use.  Dkt. No. 69-11.  The parties dispute whether, and when, the Town Board decided Candlehouse's reasonable accommodation request.[4]

During the pendency of this action, Candlehouse has utilized the Mirador property for various church related uses.  However, it has had to carry out the residential portion of its program elsewhere, requiring that its students be transported on a daily basis to the Mirador property for programming.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action on January 26, 2011, asserting six separate causes of action.  Dkt. No. 1.  Because plaintiff has voluntarily dismissed three of those claims, only three remain, including (1) discrimination on the basis of handicap, in violation of the FHA; (2) discrimination based upon disability, in violation of the ADA; and (3) a

---

[4]    Although plaintiff argues that, when considered together, two letters from defendant's attorney (dated December 14, 2010, Dkt. No. 69-13, and May 10, 2012, Dkt. No. 69-20) are tantamount to a denial, defendant argues that neither letter was a denial of plaintiff's request for a reasonable accommodation.

substantial burden on religious exercise, in violation of the RLUIPA.[5]  Dkt.
No. 1 at 7-11.  As relief, plaintiff's complaint seeks declaratory and
injunctive relief, as well as damages, costs, and attorney's fees.  *Id.* at 11-
12.  On February 28, 2011, issue was joined by the filing of defendant's
answer, in which it generally denied plaintiff's allegations and asserted
various affirmative defenses.  Dkt. No. 7.

Now that discovery has closed, both parties have filed motions for
summary judgment.  Dkt. Nos. 59, 68.  Defendant's motion seeks
dismissal of all of plaintiff's claims.  Dkt. No. 59.  Candlehouse requests
entry of partial summary judgment only with regard to its intentional
discrimination and reasonable accommodation claims under the FHA and
ADA.  Dkt. No. 68-4 at 3.  In addition, plaintiff has filed a motion to strike
defendant's expert report and preclude her from testifying at trial.  Dkt. No.
66.  Plaintiff also seeks sanctions based upon the Town's alleged failure
to produce and/or destruction of relevant evidence.  Dkt. No. 64.  Oral
argument was conducted in connection with the parties' motions on

---

[5]        In response to defendant's motion for summary judgment, plaintiff
"agree[d] to a voluntary nonsuit of its claims against Defendant under the First and
Fourteenth Amendment (Counts V and VI), and the Equal Terms Provision of the
[RLUIPA] (Count IV)."  Dkt. No. 79 at 3.  At oral argument, held on February 15, 2013,
the court dismissed those claims based upon plaintiff's agreement.

February 14, 2013, at which time the court reserved decision on all of the motions, with the exception of defendant's motion for summary judgment on the claims voluntarily dismissed by plaintiff.  Text Minute Entry Dated February 15, 2013.

III.    DISCUSSION

A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict"). In a case such as this, where parties have interposed cross-motions for summary judgment, each motion must be independently assessed, using this standard as a

backdrop. *See Light Sources, Inc. v. Cosmedico Light, Inc.,* 360 F. Supp.2d 432, 434 (D. Conn. 2005).

> B.    Overview of Plaintiff's Remaining Claims: The Statutory Framework

The claims remaining in this case allege violations of three statutory provisions. Specifically, Candlehouse alleges that the Town's actions violate the FHA and ADA, both of which prohibit discrimination in housing based upon handicap or disability. In addition, Candlehouse alleges that the Town's actions have unreasonably burdened its exercise of religion, in violation of the RLUIPA.

Under the FHA, it is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or enter because of a handicap[.]" 42 U.S.C. § 3604(f)(1). Discrimination is defined to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling[.]" 42 U.S.C. § 3604(f)(3)(b); *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 45 (2d Cir. 2002) ("*RECAP*"). Similarly, Title II of the ADA prohibits discrimination on the basis of disability by public entities, providing that "no qualified individual

18

with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132; *RECAP,* 294 F.3d at 45.  Both the ADA and FHA apply to municipal zoning determinations.  *RECAP,* 294 F.3d at 45-46.  Discrimination is actionable under the ADA and FHA pursuant to one of three distinct theories, including (1) intentional discrimination, or disparate treatment; (2) disparate impact; and (3) failure to make a reasonable accommodation.  *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 574 (2d Cir. 2003).

Plaintiff's third remaining claim arises under the RLUIPA, which provides, in pertinent part, that

> [n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on a religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that . . . institution –
>
> (A)    is in furtherance of a compelling governmental interest; and
>
> (B)    is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).  In a land-use context, a substantial burden is

interposed when "government action . . . *coerces* the religious institution to change its behavior[.]" *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 349 (2d Cir. 2007) (emphasis in original).

C.    Standing

"In every federal case, the party bringing the suit must establish standing to prosecute the action." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004).  Arising from the case and controversy requirement of Article III of the Constitution, "[i]n essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *see also Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, (2013).  The standing requirement is reflective of "an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Allen v. Wright*, 468 U.S. 737, 750 (1984) (internal quotation marks omitted).  To establish standing for purposes of the constitutional "case or controversy" requirement, a plaintiff must show that he personally has suffered an injury that is "concrete, particularized, and actual or imminent; fairly

traceable to the challenged action; and redressable by a favorable ruling."

*Clapper*, 133 S. Ct. at 1147 (internal quotation marks omitted).  Before

proceeding to the merits of the pending motions, I must first determine

*sua sponte* whether plaintiff has standing to litigate the claims asserted in

its complaint.[6]

For two reasons, I find that Candlehouse possesses the requisite

standing necessary to pursue its claims.  First, Candlehouse suffered a

concrete injury when the ZBA decided that its program failed to qualify as

the "functional equivalent of a family" under the relevant zoning provisions.

*RECAP*, 294 F.3d at 45, n.2.  In addition, because Candlehouse's

students comprise a class of individuals, all or some of whom possess

discrimination claims of their own right, and those interests are closely

aligned with those of Candlehouse, plaintiff also meets the requirements

for organizational standing.  *See id.* ("[Plaintiff] serves a class of

individuals with discrimination claims; the interests at issue are germane

to [the plaintiff]'s purpose; and no individual participation is required under

these circumstances.").  I therefore find that plaintiff has standing to

litigate the claims asserted in its complaint.  *Id.; see also McKivitz v. Twp.*

---

[6]        Defendant has not challenged plaintiff's standing in this action.

*of Stow*, 769 F. Supp. 2d 803, 817-18 (W.D. Pa. 2010)*; First Step, Inc. v. City of New London*, 247 F. Supp. 2d 135, 148 (D. Conn. 2003).

    D.    <u>Disability/Handicap</u>

In order to succeed under its FHA and ADA claims, plaintiff must establish that its students are "handicapped" under the FHA, or "disabled" as defined in the ADA.  "To demonstrate a disability under [the FHA and ADA], a plaintiff must show: (1) a physical or mental impairment which substantially limits one or more major life activities; (2) a record of having such an impairment; or (3) that [he is] regarded as having such an impairment."[7]  *RECAP*, 294 F.3d at 46; *see also Bragdon v. Abbott*, 524

---

[7]    More specifically, the term "handicap" under the FHA is defined as the following:

> [W]ith respect to a person–
> (1)    a physical or mental impairment with substantially limits one or more of such person's major life activities,
> (2)    a record of having such an impairment, or
> (3)    being regarded as having such an impairment,
> but such term does not include current, illegal use of or addiction to a controlled substance[.]

42 U.S.C. § 3602(h).  The ADA defines the term "disability" as follows:

> [W]ith respect to an individual–
> (A)    a physical impairment that substantially limits one or more major life activities of such individual;
> (B)    a record of such impairment; or
> (C)    being regarded as having such an impairment[.]

42 U.S.C. § 12102(1).

U.S. 624, 631 (1998) (finding that "[t]he ADA's definition of disability is drawn almost verbatim from . . . the definition of 'handicap' contained in the [FHA]").

The Supreme Court has articulated a three-step test for determining whether an individual's alleged impairment constitutes a disability or handicap under the ADA and FHA.  *Bragdon*, 524 U.S. at 631;[8] *see also Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 641 (2d Cir. 1998), *superseded by statute on other grounds by* 42 U.S.C. § 12102(3)(A).  The first inquiry focuses upon whether the plaintiff suffers from an impairment.  *Bragdon*, 524 U.S. at 631.  If so, then the court must next identify any major life activity potentially limited by the impairment.  *Id.*  In the third step, "tying the two statutory phrases together, [the court] ask[s] whether the impairment substantially limit[s] the major life activity."  *Id.*

The question of whether Candlehouse can satisfy the disability/handicap requirements of the FHA and ADA is fiercely contested between the parties.  Candlehouse director Mecklenborg notes that

---

[8]     Although the three-part test enunciated in *Bragdon* pertained to claims under the ADA, in its analysis, the Supreme Court determined that the ADA is to "be construed in accordance with pre-existing regulatory interpretations," including the FHA.  *Bragdon*, 524 U.S. at 631.  For this reason, I have extended the test to claims of discrimination arising under the FHA.

among those served by Candlehouse are recovering drug and alcohol

addicts.[9]  Dkt. No. 70 at ¶ 8; Dkt. No. 70-2 at 1 (explaining that

Candlehouse has assisted "hundreds of women . . . to overcome

emotional problems, such as anxiety and depression, and additions to

drugs[,] alcohol and behaviors").  The Second Circuit has held that, while

"[a]lcoholism, like drug addiction, is an 'impairment' under the definitions

of a disability set forth in the FHA, [and] the ADA, . . . mere status as an

alcoholic or substance abuser does not necessarily imply a 'limitation'

under the second part of that definition."[10]  *RECAP*, 294 F.3d at 46-47

(citations omitted).  "To prevail, a recovering drug addict or alcoholic must

_____

[9]        According to plaintiff's submissions, at the time of admission into the Candlehouse program, a student must be drug and alcohol free.  Dkt. No. 70 at ¶ 12.

[10]       In its motion for summary judgment, plaintiff argues that *RECAP* holds, unequivocally, that alcoholics are disabled.  Dkt. No. 68-4 at 8.  This argument, however, misconstrues the court's holding in *RECAP*.  *RECAP* actually held that, because one of the plaintiff's "baseline prerequisite[s] for admittance" to its facility is the "inability to live independently without suffering a relapse," then by definition plaintiff's residents were disabled.  *RECAP*, 294 F.3d at 47-48.  Here, Candlehouse's admission requirements do not mandate that a potential student suffer from any *per se* impairment under an FHA/ADA disability analysis, or, importantly, that a potential student demonstrate that her impairment limits a major life activity as required under the FHA and ADA.  While the record appears to suggest that plaintiff requires a prospective student to suffer from "life controlling issues," a term that seems to only *imply* a limitation to a major life activity, the only record evidence that supports this implication is Mecklenborg's affidavit, in which he states, in conclusory fashion, "I have personally witnessed each and every resident of Candlehouse struggle in a significant manner with at least one major life activity at the time of enrolling in Candlehouse[.]"  Dkt. No. 70 at ¶ 14.

[also] demonstrate . . . that this addiction substantially limit[s] one or more of his major life activities." *Buckley v. Consol. Edison Co. of New York, Inc.*, 127 F.3d 270, 274 (2d Cir. 1997); *see also RECAP*, 294 F.3d at 48. As a result, plaintiff in this case is not relieved of its burden to prove each of the three elements under the ADA/FHA-disability analysis, including to (1) demonstrate that its students suffer from a mental or physical impairment, (2) identify the major life activity that has allegedly been limited by the impairment, and (3) prove that the impairment caused the limitation in the previously identified major life activity.

This action presents a situation that is distinct from that presented in *Oxford House, Inc. v. Town of Babylon*, 819 F. Supp. 1179 (E.D.N.Y. 1993), and similar cases, involving programs whose constituents all suffer from the same impairment, like alcoholism or drug addiction. In this case, Candlehouse serves women struggling with a variety of impairments. Indeed, it is abundantly clear from the record that a potential Candlehouse student need not suffer from alcoholism or drug addiction in order to qualify for admission. *See* Dkt. No. 70 at ¶ 8 ("A few students at Candlehouse are admitted because of their struggle with a mental illness or diagnosis[.]"); Dkt. No. 70-2 at 1 ("[Since its inception,] hundreds of

women have been helped to overcome emotional problems, such as anxiety and depression, and addictions to drugs[,] alcohol and behaviors."). Instead, the record now before the court suggests that admission into Candlehouse depends only on whether a candidate suffers from a "life controlling issue," a phrase that is not explicitly defined anywhere in the record. *See* Dkt. No. 68-2 at ¶¶ 4, 10 (explaining that Candlehouse is an accredited Teen Challenge program, and that Teen Challenge "provides support for individuals struggling with life-controlling problems"); Dkt. No. 70 at ¶ 3 (Mecklenborg averring that "Candlehouse . . . is a[n] . . . organization which . . . restore[s] individuals who struggle with life controlling problems such as alcohol abuse and/or who struggle with emotional disorders"); Dkt. No. 70-2 at 2 (explaining that the profile of a Candlehouse student is one who is "unable to do normal life activities").

Accordingly, by virtue of their pending motions, the parties in essence have asked the court to determine how many of Candlehouse's students must be found "disabled" or "handicapped" under the ADA and FHA in order for Candlehouse to seek relief under those statutes.[11] Plaintiff contends that the inclusion of some non-disabled students into its

---

[11] Defendants do not appear to dispute that at least some of plaintiff's students may qualify as disabled under the FHA and ADA.

program does not preclude it from seeking the protections offered by the FHA and ADA. Dkt. No. 79 at 10-11 (citing *Innovative Health Sys., Inc. v. City of White* Plains, 117 F.3d 37, 48 (2d Cir. 1997); *Valley Housing LP v. City of Derby*, 802 F. Supp. 2d. 359, 384 (D. Conn. 2011) (citing *Innovative Health Sys., Inc.*).  The primary case offered by Candlehouse in support of this argument, however, is not directly on point.

In *Innovative Health Sys., Inc.*, the Second Circuit considered whether a drug rehabilitation program is protected by the ADA when some of its clients are not drug-free and, therefore, are excluded from the definition of "disability" under the ADA based upon their unlawful use of drugs.  *Innovative Health Sys., Inc.*, 117 F.3d at 48-49.  The court held that "[a]n inevitable, small percentage of failures should not defeat the rights of the majority of participants in the rehabilitation program who are drug-free and therefore disabled under both statutes."  *Id.* at 48.  In this case, however, Candlehouse assists women with "life controlling issues," a term that is not defined in the record, but does not exclusively require a woman to be suffering from a condition recognized as a *per se* impairment under the definition of disability.[12]  *See* Dkt. No. 70 at ¶ 8 ("A few students

---

[12]     *Innovative Health Sys., Inc.*'s procedural posture also distinguishes it from this case.  That matter was decided on appeal from the issuance of a preliminary

at Candlehouse are admitted because of their struggle with a mental illness or diagnosis[.]")

In any event, even assuming that *Innovative Health Sys., Inc.* stands for the proposition that a mixed-population of disabled and non-disabled students would not necessarily disqualify a program sponsor from the protections of the FHA and ADA, that case held only that a "small percentage" of non-disabled participants would not deprive the organization from the benefit of those protections. *Innovative Health Sys., Inc.*, 117 F.3d at 49. The question of what constitutes a "small percentage," however, is left unanswered by the Second Circuit's decision.[13] *See generally id.*

Without further guidance from controlling authority, and in consideration of the broad remedial purposes to be achieved by the ADA and FHA, I find that, to succeed in any of its claims under those statutes,

_____

injunction, and the court discussed the nature of the plaintiff's residents' impairments when inquiring into the likelihood-of-the-success prong of the preliminary injunction analysis. *Innovative Health Sys., Inc.*, 117 F.3d at 48. In addition, the Second Circuit appears to have assumed that a drug addict is disabled by virtue of his diagnosis without, for example, inquiring into whether his addiction actually limits a major life activity. *Id.*

[13] Interestingly, the Second Circuit expressed its doubt that *any* of the plaintiff's participants actually used drugs because, *inter alia*, the program did not permit drug use.

Candlehouse must establish that a majority of its students are disabled. This finding is consistent with the sparse case law that has addressed whether an organization that serves a mixed group of disabled and non-disabled participants is protected by the FHA and ADA. *See Innovative Health Sys., Inc.,* 117 F.3d at 49 (holding that, to the extent that "a small percentage" of residents at a drug rehabilitation program were not drug-free, the program was not precluded from the protections of the ADA and Rehabilitation Act); *Valley Housing LP v. City of Derby*, 802 F. Supp. 2d. 359, 384 (D. Conn. 2011) (finding that the plaintiff was protected by the FHA, ADA, and Rehabilitation Act where it served relapsed alcoholics); *Keys Youth Svcs. v. City of Olathe, Kan.*, 52 F. Supp. 2d 1284, 1297-1300 (D. Kan. 1999) (holding that, because the potential residents' impairments will substantially limit one or more major life activity in "at least some" of the individuals, the plaintiff was protected by the FHA).

Having determined the threshold question of how many of Candlehouse's residents must be found disabled for it to seek protection under the ADA and FHA, the next question is whether the record evidence supports a finding that the majority of Candlehouse's residents are disabled. In connection with the pending motions, the parties collectively

have submitted only partial information concerning eleven of the 110 students that have participated in Candlehouse's program.[14]  Dkt. No. 71 (sealed).   Clearly, eleven of 110 is not a majority, and thus, even assuming that all eleven case files demonstrate that those students have a disability, I am unable to conclude at this juncture that the majority of plaintiff's students are disabled.

In summary, based on the record now before me, I find that there remain genuine disputes of material fact to be resolved in connection with whether Candlehouse serves a sufficient number of disabled students to extend the protections of the ADA and FHA to its program.  As a result, this material threshold issue thus precludes the entry of summary judgment in favor of plaintiff on any of its ADA and FHA claims.[15]

D.    Intentional Discrimination

One of the theories of discrimination advanced by Candlehouse under the ADA and FHA is the claim that the Town engaged in intentional discrimination by denying the application to have its proposed use of the

---

[14]    Only one full student file is on record with the court.  Dkt. No. 85 (sealed).

[15]    Of course, this finding does not preclude the entry of summary judgment in favor of defendant because it is possible that, even assuming plaintiff can meet the threshold requirement of demonstrating it serves a disabled population, there is insufficient record evidence to give rise to a dispute of material fact as to the other elements of its various discrimination claims.

Mirador property be considered the functional equivalent of a family under the Town's relevant zoning laws. Both parties seek the entry of summary judgment with respect to this claim.

Claims of intentional discrimination under the ADA and FHA are properly analyzed utilizing the familiar, burden-shifting model developed by the courts for use in employment discrimination settings dating back to the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *RECAP*, 294 F.3d at 48-49. Under that analysis, a plaintiff must first establish a *prima facie* case of intentional discrimination under the FHA and ADA by "present[ing] evidence that animus against the protected group was *a* significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *RECAP*, 294 F.3d at 49 (internal quotation marks omitted, emphasis in original). Once a plaintiff makes out its *prima facie* case, "the burden of production shifts to the defendants to provide a legitimate, nondiscriminatory reason for their decision." *RECAP*, 294 F.3d at 49. "The plaintiff must then prove that the defendants intentionally discriminated against them on a prohibited ground." *Id.* The factfinder is permitted "to infer the ultimate fact of discrimination" if the

plaintiff has made "a substantial showing that the defendants' proffered explanation was false." *Id.* (internal quotation marks omitted).

The key inquiry in the intentional discrimination analysis is whether discriminatory animus was a motivating factor behind the decision at issue. *Tsombandis,* 352 F.3d at 579. The Second Circuit has identified the following five factors a factfinder may consider in evaluating a claim of intentional discrimination:

> (1) the discriminatory impact of the governmental decision; (2) the decision's historical background; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural sequences; and (5) departures from normal substantive criteria.

*Tsombanidis,* 352 F.3d at 580 (internal quotation marks omitted).

In this case, there is considerable record evidence reflecting that many Town residents, including members of the Town Board, were unsupportive of the prospect of Candlehouse moving into the Mirador property.[16] While potentially relevant, the intent of the Town residents is

_____

[16] Indeed, the record evidence establishes that many Town residents demonstrably opposed Candlehouse's proposed use of the Mirador property. *See*, *e.g.*, Dkt. No. 70 Exh. E (DVD) (traditionally filed, not electronically filed); Dkt. No. 70-3. A videotape recording of the neighborhood meeting held on December 22, 2008, to discuss the proposal reveals that many community members openly expressed displeasure against the prospect of Candlehouse moving into the neighborhood. Dkt. No. 70 Exh. E (DVD) (traditionally filed, not electronically filed). For example, one or more of the community residents compared plaintiff's students that are recovering

32

not the focus of the intentional discrimination inquiry, nor is the motivation of the Town Board, as an entity distinct from the ZBA.[17]  Instead, to prevail, plaintiff must demonstrate that the decisions by the Town's CEO, Dedrick, and ZBA were discriminatorily motivated.

The record evidence now before the court discloses the existence of a sharp dispute as to whether the CEO Dedrick and ZBA were, in fact, influenced by community animus in their decisionmaking.  The record does not definitively reveal the extent of interaction between members of the Town Board, some of whom were clearly opposed to the project, and CEO Dedrick, who made the initial decision to deny Candlehouse's proposal for use of the Mirador property.  Town Board member Bielecki testified during his deposition that he spoke with Dedrick regarding Candlehouse on different occasions, including prior to the board meeting on December 17, 2008, and after the neighborhood meeting held on December 22, 2008.  Dkt. No. 69-16 at 3, 6-7.  In contrast, Dedrick denies

_____

alcoholics and drug addicts to sex offenders and felons.  *Id.*  At least two Town Board members in attendance spoke out against Candlehouse moving into the area.  *Id.*  One of those Town Board members even appeared to threaten to have the district rezoned so that Candlehouse could not move in.  *Id.*  In total, four Town Board members attended this community meeting.  Dkt. No. 69-3 at 5.

[17]     As is discussed more below, the intent and motivation of the Town Board is, however, relevant to plaintiff's request for a reasonable accommodation.

speaking with any Town officials regarding the Candlehouse matter between at least October 12, 2008, and January 1, 2009. Dkt. No. 69-18 at 8-9; Dkt. No. 61 at ¶ 32.

Turning to the ZBA's motivation, in his affidavit Acting ZBA Chairman Mark Tomko states that the packet of information received by the ZBA when a party appeals a decision by CEO Dedrick typically contains only the appellant's submissions, as well as any responses to those submissions from Town officials. Dkt. No. 60 at ¶ 18. He also states that "[t]his packet does not contain any letters or correspondence from town officials regarding their feelings or interpretations of the Zoning Code." *Id.* at ¶ 9. Moreover, the transcript of the ZBA's hearing on Candlehouse's appeal does not reflect that any of the ZBA board members engaged in discriminatory questioning, or were influenced by the public comments that followed the formal presentation by plaintiff and the question-and-answer period from the ZBA board members. *See generally* Dkt. No. 60-3. The ZBA board members' questions were objective in nature, and focused on the question of whether plaintiff's organization operates as the functional equivalent of a family. *Id.* at 17-54. The ZBA's written decision is facially neutral, and focuses on the zoning ordinance's

34

definition of family.  Dkt. No. 60-4.  All of this evidence suggests that the ZBA was not influenced by discriminatory intent in denying plaintiff's appeal.

As a counterweight to this evidence, the record discloses that, before accepting any public comment at the ZBA hearing, Chairman Tomko acknowledged that whether plaintiff may establish itself in the area has created some "a lot of issues" for the community.  Dkt. No. 60-3 at 54. Although in his affidavit Tomko attempts to distance himself and the ZBA from the community's outcry, this acknowledgment at the hearing indicates that he possessed at least some awareness of the community sentiment opposed to Candlehouse's program. The fact that the ZBA heard public comment and received letters from the public in lieu of live testimony at the ZBA hearing, and made a record of the proceeding, further suggests that the ZBA was not entirely insulated from the community's disapproval of Candlehouse.[18]

For all of these reasons, I conclude that there remain genuine

---

[18]     Although the court acknowledges that, even assuming Dedrick and the ZBA were aware of the community's disapproval of Candlehouse, such awareness does not necessarily mean that Dedrick and the ZBA's decisions were motivated by discrimination.  However, plaintiff has at least submitted sufficient evidence to give rise to a dispute of fact as it relates to this issue.

disputes of material fact as to whether CEO Dedrick or the ZBA were motivated by discriminatory intent in denying Candlehouse's request to find that its program meets the functional equivalent of a family under the Town's zoning laws. As a result, the parties' motions for summary judgment, as they relate to plaintiff's intentional discrimination claim, are denied.

> E.    Disparate Impact

Candlehouse also claims that the Town's application of its zoning ordinance and decision not to find that its proposed use of the Mirador property constitutes the functional equivalent of a family resulted in a disparate impact upon Candlehouse's disabled residents. Only defendant has moved for summary judgment with respect to this claim.

"To establish a *prima facie* case under this theory, the plaintiff must show: (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *RECAP*, 294 F.3d at 52-53 (internal quotation marks omitted). "A plaintiff need not show the defendant's action was based on any discriminatory intent." *Tsombanidis*, 352 F.3d at 575. To prove that a neutral practice

has a significantly adverse or disproportionate impact "on a protected group, a plaintiff must prove the practice actually or predictably results in discrimination." *Tsombanidis*, 352 F.3d at 575 (internal quotation marks and alterations omitted). In addition, a plaintiff must prove "a causal connection between the facially neutral policy and the alleged discriminatory effect." *Id.* Once a plaintiff establishes its *prima facie* case, "the burden shifts to the defendant to prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Id.* (internal quotation marks omitted).

"The basis for a successful disparate impact claim involves a comparison between two groups – those affected and those unaffected by the facially neutral policy. This comparison must reveal that although neutral, the policy in question imposes a significantly adverse or disproportionate impact on a protected group of individuals." *Tsombanidis*, 352 F.3d at 575.

"Statistical evidence is . . . normally used in cases involving fair housing disparate impact claims." *Tsombanidis*, 352 F.3d at 575-76. "Although there may be cases where statistics are not necessary, *there*

*must be some analytical mechanism to determine disproportionate*

*impact*." *Id.* at 576 (emphasis added). A plaintiff may choose to

undertake a "qualitative comparison" to demonstrate adverse or

disproportionate impact. *Id.* at 577. This type of comparison was

described in *Tsombanidis* in the following way:

> In such a comparison, plaintiffs would have to show
> that the average recovering in West Haven has a
> greater need – qualitatively – for group living than
> does the average non-recovering in West Haven.
> This would likely require some quantification of what
> each group 'needs' from a living arrangement
> standpoint. A court could then conclude that, despite
> whether the quantitative test is met, there is a
> qualitatively disproportionate impact on recoverings
> in West Haven.

*Id.*

In this case, to prevail on its disparate impact claim, Candlehouse

must do more than merely show that the Town's enforcement of its facially

neutral zoning provisions has adversely affected its students. It must also

establish, through statistics or some other reliable analytical mechanism,

that defendant's neutral policy actually or predictably created a shortage

of housing for the individuals served by Candlehouse's program. *See*

*Tsombanidis*, 352 F.3d at 576 (reversing district court where the plaintiff

could not show that the defendant's fire code "actually or predictably

38

created a shortage of housing for recovering alcoholics in the community"); *see also Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 91 (2d Cir. 2000) (finding no disparate impact where "[t]he [plaintiffs] do not allege that [the defendant's] policy has resulted in or predictably will result in under-representation of Orthodox Jews in [university] housing"); *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 933 (2d Cir. 1988) ("To establish a *prima facie* case under the disparate impact analysis, a plaintiff must prove that the challenged practice 'actually or predictably' results in discrimination.").

Here, the parties agree that the zoning ordinance at issue is facially neutral. *Compare* Dkt. No. 65 at 24 ("It is undisputed that the Town of Vestal Zoning Code provisions at issue are facially neutral[.]") *with* Dkt. No. 79 at 16 ("Here, neither party seems to dispute that Defendant's zoning ordinance defining 'family' and/or 'functional equivalent of family' appears to be an outwardly neutral law."). They are at odds, however, over whether it disproportionally affects the group of individuals served by Candlehouse. Plaintiff has not provided any statistical evidence demonstrating that potential candidates for its program suffer from a shortage of housing as a result of defendant's policies. Nor has plaintiff

undergone a qualitative comparison between that group and one that does not suffer from any of the same impairments, and evaluated whether there is a greater need of residential housing for its group of students.

Candlehouse argues that, because a district court in New Jersey found that "'people who are handicapped by alcoholism or drug abuse are more likely to need a living arrangement . . . in which groups of unrelated individuals reside together in residential neighborhoods,'" this gives the court license to find that plaintiff has met its burden of demonstrating the requisite disparate impact caused by application of the Town's zoning laws. Dkt. No. 79 at 17 (quoting *Oxford House, Inc. v. Twp. of Cherry Hill*, 799 F. Supp. 450, 461 (D. N.J. 1992)). Plaintiff has conceded, however, that not all of its students are recovering alcoholics or drug addicts. Instead, the record is clear that Candlehouse serves a mixed group of women who suffer from "life controlling issues" (which, again, is not defined), including, *inter alia*, emotional distress unrelated to drugs or alcohol use. Dkt. No. 76 at ¶¶ 9, 10; Dkt. No. 68-1 at ¶ 11. A comparison between a group of *only* alcoholics or *only* drug addicts and plaintiff's mixed population is therefore inappropriate.

Plaintiff has failed to cite, and the court has been unable to locate,

any cases finding that a facially neutral ordinance has adversely or disproportionately impacted a group of individuals with varying impairments. In any event, plaintiff's complaint alleges that "several non-religious residential treatment homes and/or group homes similar to the use proposed by [plaintiff] are located in the RA1[,] including a home for the mentally disabled." Dkt. No. 1 at ¶ 15. Although not conclusive, this allegation suggests that there are available group homes in the relevant residential areas, in which at least some of plaintiff's students could reside. The existence of other group homes in residential areas also suggests that the facially neutral ordinance does not actually or predictably discriminate against at least some, depending on their impairment, of plaintiff's students.

I note, moreover, that plaintiff's only proof the students are in need of a "family-style residential living arrangement" to assist in "the recovery process" is the affidavit of plaintiff's director, Richard Mecklenborg. Dkt. No. 70 at ¶¶ 16, 21. That affidavit conclusorily states that a residential neighborhood allows students to spend much of their time outside, thereby providing "incentive" and "motivation" for its residents. *Id.* at ¶ 19. Importantly, however, Mecklenborg does not explain how a location in a

non-residential area precludes the students from spending the same amount of time outdoors, nor does he articulate a basis for his belief that access to the outdoors provides an incentive or motivation for Candlehouse students.  *See generally* Dkt. No. 70.  Indeed, there is record evidence that students are tightly restricted in their ability to go outside of the residence into the community, particularly in the beginning months after arriving.  Dkt. No. 70 Exh. E (traditionally filed, not electronically filed); Dkt. No. 68-1 at ¶ 13 (explaining that students go outdoors with supervision).

Finally, to prevail on a disparate impact claim, plaintiff must show that defendant's admittedly facially neutral ordinances predictably discriminates against plaintiff's students as a whole, and not a group of, for instance, *only* alcoholics or *only* drug addicts.  Because it serves a mixed population of students, suffering from potentially diverse impairments, Candlehouse cannot establish that the facially neutral ordinance will predictably discriminate against that group, comprised of students with varying needs.

In light of the lack of statistical or other evidence reliably demonstrating a dispute of material fact regarding the existence of the

required disparate impact as a result of the Town's facially neutral zoning ordinance and its application, I conclude that no reasonable factfinder could rule in favor of the plaintiff with respect to plaintiff's disparate impact cause of action.[19]  Accordingly, summary judgment is granted in the Town's favor dismissing this claim.

G.    Reasonable Accommodation

Plaintiff has also asserted a reasonable accommodation claim under the FHA and ADA against the Town.  Both parties seek the entry of summary judgment on this cause of action.

Under the FHA and ADA, "a governmental entity engages in a discriminatory practice if it refuses to make a 'reasonable accommodation' to 'rules, policies, practices or services when such accommodation may be necessary to afford a handicapped person equal opportunity to use and enjoy a dwelling.'"  *Tsombanidis,* 352 F.3d at 578 (quoting 42 U.S.C. § 3604(f)(3)(B)) (alternation omitted).  "Thus, these statutes require that

---

[19]    This is true notwithstanding whether plaintiff is able to prove that the majority of its students are disabled under the ADA and FHA.  More specifically, even assuming that plaintiff could prove that its student population is comprised of a sufficient number of disabled persons thereby establishing that Candlehouse is protected by the ADA and FHA, it has failed to come forward with specific facts showing a genuine dispute of material fact for trial as to whether defendant's zoning ordinance actually or predictably discriminates against its students.

changes be made to such traditional practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling." *Tsombanidis*, 352 F.3d at 578 (internal quotation marks omitted); *see also Millington v. Temple Univ. Sch. of Dentistry*, 261 F. App'x 363, 367, n.5 (3d Cir. 2008) ("To show discrimination based on a failure to provide reasonable accommodations the requested accommodation not only must be reasonable; it must also be necessary, and it must not fundamentally alter the nature of the program." (citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 681-83 (2001)). "Whether or not something constitutes a reasonable accommodation is necessarily fact-specific." *Wernick v. Fed. Reserve Bank*, 91 F.3d 379, 384 (2d Cir. 1996).

To prevail under a reasonable accommodation theory in this type of case, a plaintiff "must show that, but for the accommodation, [its residents] likely will be denied an equal opportunity to enjoy the housing of their choice." *Tsombanidis*, 352 F.3d at 578 (internal quotation marks omitted). "A defendant must incur reasonable costs and take modest, affirmative steps to accommodate the handicapped as long as the accommodations sought do not pose an undue hardship or a substantial burden." *Id.* In addition, "[t]he [defendant] is not required to grant an exception for a

group of people to live as a single family, but it cannot deny the variance request based solely on plaintiffs' handicap where the requested accommodation is reasonable." *Id.* at 580.

In this instance, there is a dispute of material fact as to whether defendant's denial of plaintiff's request for a reasonable accommodation was based on the impairments of its students. Specifically, plaintiff alleges that, in its letter dated December 14, 2010, responding to plaintiff's request for a reasonable accommodation, defendant stated that it "was not agreeable at this time to [plaintiff's] demand." Dkt. No. 68-3 at ¶ 78. However, defendant disputes that this letter actually responded to plaintiff's request for a reasonable accommodation.[20] Dkt. No. 74 at ¶ 78. According to a letter from defendant's counsel dated May 10, 2012, it appears that defendant formally denied plaintiff's request for a reasonable accommodation in a private executive session of the Town Board. Dkt. No. 69-20 at 1. As a result, there is no direct evidence upon which I may rely in determining the motivation for the Town Board's decision to deny the requested accommodation.

---

[20]     Significantly, defendant's counsel, in a later letter to plaintiff's attorney, indicated that, when he stated that the Town was not agreeable to plaintiff's request, he was, in fact, referring to plaintiff's request for a reasonable accommodation. Dkt. No. 69-20 at 1.

In response to an interrogatory, the Town has offered the following explanation for its decision to deny plaintiff's request for an accommodation:

> The defendant has a legitimate interest in creating single-family neighborhoods comprised of single-family residences. The plaintiff's proposed use of a nonconforming structure as a one family residence would cause a fundamental alteration in the zoning scheme of the town. Furthermore, the proposed use and the proposed density of such use also seems contrary to the long-standing zoning scheme involved herein. record is not clear why defendant denied plaintiff's request for a reasonable accommodation.

Dkt. No. 69-3 at ¶ 11. This rationale does not implicate the impairments of Candlehouse students as the basis for defendant's denial of the reasonable accommodation.

In contrast to this evidence, however, there is evidence that at least some of the Town Board members were biased against Candlehouse and its proposal. For example, a review of the recording of the neighborhood meeting held on December 22, 2008, demonstrates that at least two of the Town Board members spoke out against the prospect of Candlehouse moving into the neighborhood. Dkt. No. 7 Exh. E (traditionally filed, not electronically filed). Indeed, as was previously noted, one Town Board member went so far as to seemingly threaten to have the area rezoned so

46

that Candlehouse could not move into the Mirador property. *Id.* Because

there is conflicting evidence as to the basis for the Town Board's denial of

plaintiff's reasonable accommodation, defendant's motion for summary

judgment, as it relates to this claim, is denied.[21]

## H.    Plaintiff's RLUIPA Substantial Burden Claim

In its sole remaining non-ADA/FHA claim, plaintiff alleges that,

through its conduct, the Town has placed an undue substantial burden on

its religious exercise rights guaranteed under the RLUIPA.  Only

defendant has moved for summary judgment on this claim.

Section 2000cc(a)(1) of the RLUIPA provides, in pertinent part, as

follows:

> No government shall impose or implement a land use
> regulation in a manner that imposes a substantial
> burden on the religious exercise of a person,

---

[21]    The entry of summary judgment concerning this cause of action is also precluded by the existence of an existing dispute of fact as to whether the accommodation sought by Candlehouse is necessary to serve its students' impairments.  As was already discussed, those impairments vary, and there is no record evidence, aside from Mecklenborg's affidavit and deposition testimony, that the students' impairments require a residential neighborhood for rehabilitation.  The nature of the Candlehouse program, however, is such that the students are strictly managed in virtually all of their daily activities, and do not go out into the community until they have completed at least three to five months of the program.   When they are allowed out into the community, the students are supervised.  Given these program characteristics, it is not at all clear what a residential neighborhood offers the students that a non-residential neighborhood could not, or that the program could not exist or be successful in a non-residential neighborhood.

> including a religious assembly or institution, unless
> the . . . imposition of the burden . . . is in furtherance
> of a compelling governmental interest; and . . . is the
> least restrictive means of furthering that compelling
> governmental interest.

42 U.S.C. 2000cc(a)(1). In land-use contexts, the Second Circuit has held that a "substantial burden" occurs when "a government action . . . *coerces* the religious institution to change its behavior." *Westchester Day Sch.*, 504 F.3d at 349 (emphasis in original). "[A] burden need not be found insuperable to be held substantial." *Id.*

"[T]o establish a prima facie violation of RLUIPA, a plaintiff must show that the land use regulation at issue as implemented: (1) imposes a substantial burden, (2) on the religious exercise, (3) of a person, institution, or assembly." *Roman Catholic Diocese of Rockville Ctr., N.Y. v. Inc. Vill. of Old Westbury*, No. 09-CV-5195, 2012 WL 1392365, at *7 (E.D.N.Y. Apr. 23, 2012) (internal quotation marks omitted). Once a plaintiff has established a *prima facie* case, "the burden shifts to the government to demonstrate that the regulation furthers a compelling governmental interest and is the least restrictive means of furthering that compelling interest." *Roman Catholic Diocese*, 2012 WL 1392365, at *7.

While the RLUIPA generally forbids governmental action that

substantially burdens religious exercise and lacks a compelling interest, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *accord, Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfiled, C.T.*, 853 F. Supp. 2d 214, 221-22 (D. Conn. 2012). "[E]ven if the [neutral and generally applicable] statute has the effect of incidentally burdening [the plaintiff's] religious exercise, the statute is constitutional so long as it satisfies a rational basis review." *Chabad*, 853 F. Supp. 2d at 225. "Under rational basis review, the statute must be reasonable and not arbitrary, and it must bear a rational relationship to a permissible state objective." *Id.* (internal quotation marks and alterations omitted).

In this case, Candlehouse argues that, because the Town's ordinance defining family and its functional equivalent restricts its full use of the Mirador property by precluding it from operating a residence with twelve students, the Town has placed a substantial burden on its religious exercise. Dkt. No. 79 at 25. This argument, however, ignores the Second Circuit's requirement that "[t]here must exist a close nexus between the

coerced or impeded conduct and the institution's religious exercise for such conduct to be a substantial burden on that religion." *Westchester Day Sch.*, 504 F.3d at 349. Accordingly, for its RLUIPA claim to survive defendant's motion for summary judgment, Candlehouse must demonstrate the existence of a genuine dispute of material fact as to whether there is a close nexus between the Town's decision to deny its proposed use of the Mirador property as a residence for more than five unrelated people ("the coerced or impeded conduct") and its religious exercise. A careful review of the record reflects that plaintiff has satisfied this burden.

The record reveals that Candlehouse is a Teen Challenge-affiliated program; Teen Challenge operates as a Christian faith-based program that offers "a balance of Bible classes, work assignments, and recreation." Dkt. No. 68-2 at ¶¶ 3, 4; Dkt. No. 70 at ¶ 3. There is evidence that the Christian faith-based program is separate from the residential program. *See* Dkt. No. 68-2 at ¶ 10 ("Along with the Christian faith-based program, the other important component of Teen Challenge's program is the family-like residential living arrangement each center provides to its students[.]"); Dkt. No. 70 at ¶¶ 26, 27 (explaining that the church located on the Mirador

property is used for Teen Challenge classes and the print shop); *see also* Dkt. No. 70 at ¶ 22 ("In September 2008, Candlehouse began considering the purchase of [the Mirador property] for the purposes of combining its residential campus and work training programs with the religious component of the Teen Challenge program[,] which includes Bible study and classes").  Although Mecklenborg states that Candlehouse's inability to operate a residence at the Mirador property precludes students from participating in evening activities, he does not include any support for a finding that these evening activities implement or incorporate religious teachings.  Dkt. No. 76 at ¶ 1.  In addition, Mecklenborg and Cheryl Clever, a former student and graduate of Candlehouse, explain that having a residence on the Mirador property, which is located in a residential neighborhood, provides students a "unique opportunity to bond," allows them to "develop and maintain relationships," provides a safe environment with access to the outdoors, and "enhances the spiritual element of the program."  Dkt. No. 70 at 8-10, 18-19; Dkt. No. 68-1 at ¶ 13.  These explanations, however, provide the court with little guidance as to what types of, if any, religious activity occurs at the residence, as distinct from the church property, which plaintiff is permitted to utilize for

religious purposes.

At the ZBA hearing, however, counsel for plaintiff stated that "the emphasis through [the] program is . . . to increase their faith and their intimacy with God through a disciplined Christ-centered approach to a family living experience[.]" Dkt. No. 60-3 at 7. In addition, counsel explained that the daily routine for Candlehouse students includes periods for worship, chapel, and devotional time interspersed throughout the day. *Id.* at 13-14. The New York General Assemblies of God oversees the Candlehouse program, and Candlehouse is an accredited Teen Challenge program. *Id.* at 15; Dkt. No. 68-2 at ¶ 8. All of this evidence suggests that the Candlehouse program incorporates religious components in every aspect of a student's experience. As a result, I find that there is a dispute of fact as to whether the Town's denial of its proposed use of the Mirador property has affected Candlehouse's religious exercise.

Notwithstanding whether there is a nexus between Town's conduct and Candlehouse's religious exercise, there is nothing in the record to support a finding that the Town's conduct substantially burdened its religious exercise. *See Westchester Day Sch.*, 504 F.3d at 349 (finding that, in land-use contexts, the relevant inquiry is whether "government

action . . . directly *coerces* the religious institution to change its behavior"). First, under the Town's ordinances, Candlehouse is permitted to operate a residential facility for up to five unrelated persons. Candlehouse has not set forth any reason how precluding it from housing an additional seven students coerces it to change how it operates its program in relation to its religious exercise. *See Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 326 F. Supp. 2d 1140, 1152 (E.D. Ca. 2003) (finding that for a burden to be substantial, "the governmental regulation must compel action or inaction with respect to the sincerely held belief; mere inconvenience to the religious institution or adherent is insufficient" (citing *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)). Second, Candlehouse's argument that it is financially burdened by operating two separate facilities is unpersuasive because it ignores that it will have to operate two separate properties even if it is permitted its desired use of the Mirador property because the Mirador property is comprised of two separate properties – 400 and 401 Mirador Drive. *See World Outreach Conf. Ctr. v. City of Chicago*, 591 F.3d 531 (7th Cir. 2009) (finding no substantial burden on the plaintiff where city denied it permission to demolish a building owned by plaintiff because, *inter alia*, there was no record support for the alleged money lost

by the plaintiff, and the organization had suitable alternative site). Accordingly, because plaintiff has failed to submit evidence giving rise to a dispute of fact as to whether its religious exercise has been substantially burdened, defendant's motion for summary judgment on this claim is granted.

I.    Plaintiff's Motion to Preclude Defendant's Expert Testimony

The Town has engaged Cassandra L. Bransford, Ph.D., LCSW-R, to serve as an expert at trial.  Dkt. No. 66-2.  Dr. Bransford has a Bachelor's degree in English, Master's degree in Social Work, and doctorate in Social Work/Advanced Practice, and for the past eight years has served as an Associate Professor of Social Work at Binghamton University.  *Id.* at 16-17.

In anticipation of testifying at trial, Dr. Bransford authored a report dated July 31, 2012, in which she rendered and offered a basis for the following seven opinions: (1) "Candlehouse does not meet the sociological criteria for a functional family"; (2) "Candlehouse is a Therapeutic Community, not an adult group home/halfway house"; (3) "Candlehouse doesn't need to be located in a residential zone"; (4) "There is no solid research evidence to corroborate Candlehouse's claims to effectiveness";

(5) "Candlehouse does not follow evidence-based protocols for treating individuals with co-occurring disorders"; (6) "There is no evidence to support that Candlehouse residents are disabled or impaired"; and (7) "There is documentation as to the transience of Candlehouse residents." Dkt. No. 66 at 12-13. Plaintiff now seeks an order striking Dr. Bransford's report and precluding her from testifying at trial. *See generally* Dkt. No. 66. Defendant has opposed plaintiff's motion. *See generally* Dkt. No. 83.

      1.   <u>Governing Legal Principles</u>

The admission of expert testimony in an action pending in a federal court is governed by Rule 702 of the Federal Rules of Evidence, which provides that

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and methods; and

>   (d)   the expert has reliably applied the principles
>         and methods to the facts of the case.

Fed. R. Evid. 702.  When applying this standard to expert testimony proffered by a party, a trial court is required to perform a gatekeeping function to ensure "that the expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Down Pharms, Inc.*, 509 U.S. 579, 597 (1993).

As a threshold matter, the trial court must examine the question of whether the challenged opinion evidence can satisfy the requirement of Federal Rule of Evidence 401 that evidence offered at trial be relevant to a controverted claim or defense in the case.  *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).  If the requisite degree of relevance is found, the court must then proceed to determine whether the expert opinion sought to be admitted has a sufficiently reliable foundation to allow its consideration by the factfinder.  *Amorgianos*, 303 F.3d at 265.  This latter inquiry is informed by various relevant factors, including whether (1) the theory or technique can be (and has been) tested; (2) it has been subjected to peer review and publication; (3) there is a known or potential rate of error; and (4) the theory or technique has gained a "degree of acceptance within" the pertinent scientific or technical

community.  *Daubert*, 509 U.S. at 592-94.  "'General acceptance[,]' [however,] is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but . . . the trial judge [has] the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Id.* at 587.  Importantly, while both Rule 702 and the Supreme Court's decisions in *Daubert*, and later in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), identify specific factors bearing on the question of reliability, courts have stressed that "the *Daubert* inquiry is fluid and will necessarily vary from case to case.  *Amorgianos*, 303 F.3d. at 266; *see also Daubert*, 509 U.S. at 594.

Rule 702 does not require rejection of opinions based solely upon the court's disagreement with the conclusions reached or the correctness of the opinions offered.  *Daubert*, 509 U.S. at 595.  Moreover, although in the first instance the burden of establishing the admissibility of expert testimony in question rests with the proponent, any doubts as to whether the expert's testimony will be useful should be resolved in favor of admissibility.  *Lappe v. Am. Honda Motor Co., Inc.,* 857 F. Supp. 222, 226 (N.D.N.Y. 1994) (Hurd, M.J.).

2.    <u>Application of Legal Principles</u>

When analyzed against the backdrop of the foregoing principles, only three of Dr. Bransford's seven opinions listed in her report satisfy the criteria for admission at trial.  I address each of the opinions below.

a.    <u>Functional Family</u>

One of the opinions offered by Dr. Bransford concerns whether Candlehouse meets the sociological criteria for a functional family.  Dkt. No. 66-2 at 12.  Dr. Bransford begins her recitation concerning this topic by stating "it may be useful first to identify what sociologists and the socioglical literature have to say about what constitutes a functioning family."  *Id.* at 2.  Conspicuously absent from Dr. Bransford's analysis, however, is any reference to the criteria set out in the Town's zoning ordinance defining family and its functional equivalent.  Dr. Bransford does not disclose the basis for correlating the sociological criteria for defining "family" or its functional equivalent and the definitions provided in the Town's ordinance.[22]  Similarly, the relevant zoning provision is completely

_____

[22]    Indeed, based upon the recitation of the materials she was provided in preparation for her report, it appears that Dr. Bransford never actually reviewed any of the Town's zoning code, including the relevant provisions at issue in this case.  *See* Dkt. No. 66-2 at 2 (listing fourteen items that "were provided to [her] by defendant's attorney's office").

58

devoid of any reference to the sociological criteria listed by Dr. Bransford in her report. Dkt. No. 60-1 at 8 (Town of Vestal Zoning Article I, Section 24-1). For these reasons, I find that Dr. Bransford's opinions on this subject demonstrate a lack of the reliability required for admission under Rule 702.

In addition, notwithstanding Rule 702, Dr. Bransford's opinions regarding whether Candlehouse's students operate as a family or the functional equivalent thereof are lacking in probative value because they do not relate to the Town's zoning code. For example, whether Candlehouse's students operate as a family when considered in light of the sociological criteria cited by Dr. Bransford does not make it more or less likely that the Town discriminated against plaintiff under the ADA or FHA in deciding whether Candlehouse satisfies the criteria set forth in the relevant zoning provision. For this reason, the expert's opinions regarding this matter are inadmissible pursuant to Rule 401 and 402 of the Federal Rules of Evidence. *See* Fed. R. Evid. 401(a) ("Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence[.]"); Fed. R. Evid. 402 ("Relevant evidence is admissible[.]"). In any event, however, whatever minimal relevance Dr.

Bransford's opinions regarding the definitions of family and the functional equivalent of a family using sociological criteria may carry, that probative value is substantially outweighed by the risk of confusion to the jury when considering her opinions, and attempting to reconcile them with the facts of this case, which relate only to a municipality's zoning code and the intent of that municipality's officials in interpreting that zoning code. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues[.]"). For all of these reasons, this portion of Dr. Bransford's report is stricken, and she is precluded from testifying on this matter at trial.

### b. Disability

In her report, Dr. Bransford also offers her opinion concerning whether Candlehouse residents are "disabled or impaired." Dkt. No. 66-2 at 11, 12-13. This portion of the expert's report is equally problematic. Dr. Bransford did not address the question of disability in the context of the ADA and FHA, neither of which is even referenced in the report. Moreover, the title of this section of her report, "Are Candlehouse Residents Disabled or Impaired?," signals a critical misconception of how

the trier of fact is required to determine disability.  Dkt. No. 66-2 at 11.

Under the ADA and FHA, "disabled" and "impaired" are not co-extensive.

Instead, one of the ways to find that a person is disabled under the ADA

and FHA is for the factfinder to first determine whether a person at issue

suffers from an impairment.  42 U. S. C. §§ 3602(h), 12102(1).  If an

impairment is discerned, then the factfinder must determine whether that

impairment substantially limits a major life activity.  *Id.*  Dr. Bransford's

report, in contrast, does not undergo this analysis, and instead suggests

that the terms are interchangeable, which is not correct under the ADA

and FHA.

Additionally, I note that the question of whether Candlehouse serves

a disabled population can only be determined by the factfinder after

applying the law set forth under the ADA and FHA.  While it is true that

Rule 704 of the Federal Rules of Evidence does not automatically

preclude testimony from an expert on an ultimate issue such as this, the

Second Circuit has unequivocally held that, despite Rule 704, trial experts

may not opine on such an ultimate issue.  *Hygh v. Jacobs*, 961 F. 2d 359,

363 (2d Cir. 1992).  Specifically, the Second Circuit has held that,

> [w]hile Rule 704 has abolished the common law
> 'ultimate issue' rule, however, it has not 'lowered the

bars so as to admit all opinions.' This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion. . . . Even if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard – explicit or implicit – to the jury. Whereas an expert may be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury.

*Hygh*, 961 F.2d at 363 (internal citations and alterations omitted)). For this reason, Dr. Bransford is precluded from testifying as to whether Candlehouse serves a disabled or handicapped population, and that portion of her report is stricken.[23]

c. Candlehouse's Effectiveness; Following Evidence-Based Protocols

Dr. Bransford's report also evaluates whether the Candlehouse program effectively addresses its students' various disorders. Dkt. No. 66-2 at 7-8. Specifically, Dr. Bransford observes that the agency's claims of success "have been widely refuted in the scientific literature."[24] *Id.* at 8.

_____

[23] I further find that, to the extent that Dr. Bransford has analyzed whether a random sampling of Candlehouse's students are disabled by using sociological criteria, her conclusion on the matter is substantially outweighed by the risk of confusion by the jury in distinguishing between the criteria relied on by Dr. Bransford, and the criteria it is required to consider under the ADA and FHA. Fed. R. Evid. 403.

[24] The portion of Dr. Bransford's report addressing this issue is provocatively entitled "Candlehouse's Effectiveness: Myth or Fact." Dkt. No. 66-2 at 7.

She also concludes that "Candlehouse does not follow an evidence-based protocol for treating individuals with co-occurring disorders." *Id.* at 12. Neither of these inquiries, however, bear relevance on any of the claims or defenses in this action. Whether Candlehouse's program is successful does not make it more or less likely that the Town discriminated against Candlehouse under the ADA, FHA, or RLUIPA. Fed. R. Evid. 402. Similarly, whether Candlehouse uses a certain methodologies (scientific or otherwise) to implement its program is irrelevant to the question of discrimination based on disability or religion. *Id.* In addition, whatever relevance these opinions do have is substantially outweighed by the risks of unfair prejudice and confusion of the issues to a jury because plaintiff's claims do not relate at all to whether Candlehouse's program meets the criteria set forth by Dr. Bransforth. Accordingly, the portion of Dr. Bransford's report opining on these two issues is stricken, and she is precluded from testifying about them at trial.

d.      Dr. Bransford's Other Opinions

The remaining opinions set forth in Dr. Bransford's report, while of marginal relevance, appear to be supported and within her range of expertise. Accordingly, while the portions of her report identified above

are stricken, and she is precluded from testifying about them at trial, I will permit her to testify concerning the remaining opinions, including whether (1) Candlehouse is a therapeutic community or instead and adult home/halfway house; (2) Candlehouse needs to be located in a residential zone; and (3) there is documentation concerning the transience of Candlehouse residents.

J.     Sanctions/Spoliation

The final pending motion to be addressed is plaintiff's request for sanctions based upon the Town's alleged destruction of, or failure to produce, relevant information that was requested during discovery. Dkt. No. 64. Plaintiff argues that (1) the Town failed to take the requisite actions to preserve evidence and notify Town Board members and other Town officials of the duty of preservation; (2) the Town failed to collect and produce relevant documents and records from all Town officials in response to plaintiff's discovery demands, as revealed during the depositions of various Town officials; and (3) regularly deleted e-mails and other documents involving claims and defenses in this case, both prior to and during the course of this litigation. *See generally* Dkt. No. 64-10. As relief, plaintiff asks the court to issue an adverse inference instruction, as

well as to preclude Town officials from testifying that (1) they were not motivated by any discriminatory bias, (2) they themselves did not maintain any discriminatory bias against plaintiff, and (3) they were not persuaded or influenced by the neighborhood opposition. *Id.* at 14-15. Plaintiff also moves for attorney's fees incurred in bringing its motion. Dkt. No. 89 at 12. Defendant opposes the motion and requests sanctions against plaintiff for filing a "frivolous" motion. *See generally* Dkt. No. 80.

Although plaintiff's allegations are troubling, it was obligated to confer in good faith with opposing counsel, and to thereafter seek an order compelling discovery if counsel could not agree on a course of action. Fed. R. Civ. P. 37(a)(1) ("[A] party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure[.]"). Had plaintiff followed that course of action, and the Town continued to neglect its discovery obligations, the court would then have been positioned to issue the sanctions requested by plaintiff and listed in Rule 37(b) as a result of the Town's failure to obey the order.[25]  *See Pro Bono Invs., Inc. v. Gerry*, No. 03-CV-4347, 2005 WL

---

[25]     Among the sanctions available under that section are the following:

65

2429767, at *1 (S.D.N.Y. Sept. 30, 2005) ("By its terms, Rule 37 requires a meet-and-confer conference and authorizes sanctions only after a motion is granted for discovery is made after a motion is filed.").  Because plaintiff instead has attempted to bypass these meaningful preliminary requirements by requesting the equivalent of sanctions available under Rule 37(b), I do not find it appropriate to award such relief.  In order to avoid unfair prejudice to plaintiff, however, and because the court retains the discretion to impose sanctions on a party for misconduct in discovery

_____

| (i)   | directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; |
|-------|-------------------------------------------------------------------------------------|

| (ii)  | prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; |

| (iii) | striking pleadings in whole or in part; |

| (iv)  | staying further proceedings until the order is obeyed; |

| (v)   | dismissing the action or proceeding in whole or in part; |

| (vi)  | rendering a default judgment against the disobedient party; or |

| (vii) | treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination. |

Fed. R. Civ. P. 37(b)(2)(A).

absent a discovery order, *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002), the court will permit plaintiff to submit a limited document discovery request to defendant seeking additional evidence that it reasonably believes is still available and relevant to the claims and defenses in this action, as revealed by the deposition testimony of Town officials.

The question of the destruction or non-preservation of evidence, which amounts to an allegation of spoilation, is equally, if not more, troublesome. Spoliation is defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999) (citing *Black's Law Dictionary* 1401 (6th ed. 1990)). For obvious reasons, one who engages in spoliation should not be permitted to benefit from such wrongdoing. *West*, 167 F.3d at 779.

Courts are invested with broad discretion in determining an appropriate sanction to be imposed in the event it finds spoliation. *West,* 167 F.3d at 779. The sanctions available to a court can range in severity from dismissal to an adverse inference jury instruction. *Wade v. Tiffin*

*Motorhomes, Inc.,* 686 F. Supp. 2d 174, 196 (N.D.N.Y. 2009) (Suddaby, J.) (citing *Allstate Ins. Co. ex rel. Lothridge v. Gonyo*, No. 07-CV-1011, 2009 WL 962698, at * 8 (N.D.N.Y. Apr. 8, 2009) (Treece, M.J.)).    The Second Circuit has noted that any sanction imposed "should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *West*, 167 F.3d at 779.  When applying this principle, a court should impose a sanction designed to

> (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'

*Id.* (quoting *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir. 1998)).

A common sanction imposed by the court to punish a party's spoliation is a spoliation jury charge, in which the jury is instructed that it may draw an adverse inference based upon the destruction. *Chin v. Port Auth. of New York and New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012).  To warrant the issuance of such an instruction, the moving party must demonstrate that (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence

was relevant to an adverse party's claim or defense such that a reasonable trier of fact could find that it would support the claim or defense. *Chin*, 685 F.3d at 162; *Wade,* 686 F. Supp. 2d at 193. The decision of whether to issue an adverse inference instruction based upon lost evidence rests within the discretion of the trial court. *Chin*, 685 F.3d at 162.

In many instances, a spoliation claim arises out of an alleged failure of a party to implement a "litigation hold" based upon an existing or pending suit. A party's failure to implement a "litigation hold," in the face of impending litigation, does not constitute *per se* gross negligence warranting an adverse inference instruction. *Chin*, 685 F.3d at 162. Rather, that failure is but one of several relevant factors to consider in determining whether such a sanction is warranted. *Id.* Moreover, while a finding of gross negligence in failing to preserve evidence may provide a basis for an adverse inference, such a finding does not require the trial court to provide such an instruction. *Id.*; *Residential Funding Corp.*, 306 F.3d at 109.

Here, as a threshold matter, plaintiff's motion requires the court to determine whether the Town's "duty to preserve" attached in January

2011, when this action was filed, or on May 5, 2010, when plaintiff sent its letter to defendant notifying the Town of Candlehouse's position that the Town's determination violated federal laws. *Compare* Dkt. No. 80 at 9 *with* Dkt. No. 89 at 6. "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423 (2d Cir. 2001). Because defendant in this case has been involved in a dispute with plaintiff since at least September 2008, it is not unreasonable to find that the Town "should have known that the evidence [sought by plaintiff] may be relevant to future litigation" by May 5, 2010, thereby triggering a duty to preserve relevant evidence. *West*, 167 F.3d at 779.

Next, I must decide whether evidence at issue was intentionally destroyed. *See Fujitsu Ltd.*, 247 F.3d at 436; *Residential Funding Corp.*, 306 F.3d at 108 ("[T]he culpable state of mind factor is satisfied by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently." (internal quotation marks, alterations, and emphasis omitted)). If defendant did not notify the relevant Town officials of their duty to preserve evidence, at a minimum,

this is sufficient to establish negligence.  Notably, defendant does not argue that its attorneys notified the relevant Town officials, whose e-mails were allegedly deleted, to search for information requested by plaintiff. *See generally* Dkt. Nos. 80, 81.

The third consideration is whether the evidence alleged to have been destroyed is relevant to any of plaintiff's claims.  *Residential Funding Corp.*, 306 F.3d at 107.  In this instance, the evidence alleged to have been destroyed consists of e-mails to and from Town officials, and specifically Town Board members, regarding the Candlehouse matter. Those e-mails are alleged to include those between Town Board members and residents, as well as among Town Board members themselves. Those communications are potentially relevant to plaintiff's intentional discrimination claim because the surrounding circumstances and history leading up to the ZBA's decision that plaintiff's program does not constitute the functional equivalent of a family are relevant considerations when determining whether the ZBA was motivated by discriminatory intent.[26]  In any event, the e-mails could also be relevant to plaintiff's

---

[26]    In addition, although it is not alleged, it is possible that some of the discarded e-mails were between Town Board members and ZBA members, and that those lost e-mails may have disclosed the Town Board members' feelings regarding the Candlehouse matter.

reasonable accommodation claim because it was the Town Board that made the decision to deny the request for a reasonable accommodation. If the e-mails now sought by plaintiff demonstrate discriminatory bias, then they could tend to show that the Town Board denied the reasonable accommodation on the basis of discrimination.

Despite all of these findings, I am not inclined, at this juncture, to impose the sanctions sought by plaintiff, primarily because I do not find that the record has been sufficiently developed to determine what led to the destruction, if any, of relevant emails by Town officials. Accordingly, plaintiff's motion for sanctions is denied, without prejudice to renewal at trial. Based upon the testimony adduced at trial, the court reserves the right to include an adverse inference charge in its jury instructions based upon the allegation of spoliation.

IV.    SUMMARY AND RECOMMENDATION

Based upon the record now before the court, I conclude that there remains a genuine dispute of material fact as to whether Candlehouse serves a disabled or handicapped population under the ADA and FHA, a threshold determination that must be made in order to resolve any claim of discrimination under those provisions. Similarly, issues of fact preclude a

finding as a matter of law that defendant intentionally discriminated against the plaintiff and its students, and in denying plaintiff's request for a reasonable accommodation. I do, however, find that no reasonable factfinder could conclude, based upon the existing record, that the requirements to establish a disparate impact claim under the FHA and the ADA have been satisfied. For this reason, defendant's motion for summary judgment on that claim is granted. Similarly, I conclude that plaintiff has failed to demonstrate that a reasonable factfinder could find the requisite burden upon plaintiff and its students in their religious exercise, sufficient to support a claim under the RLUIPA.

Turning to plaintiff's non-dispositive motions, I find that substantial portions of the report of defendant's expert fails to meet the criteria of Federal Rule of Evidence 702 and *Daubert*, and in any event are excludable under Rules 401, 402 and 403. For those reasons, I will strike those portions of the expert report and preclude the expert from testifying on those subjects at trial. Additionally, I conclude that, having failed to avail itself of the remedies afforded under Rule 37(a) of the Federal Rules of Civil Procedure and to confer with defendant's counsel before bringing the instant motion, Candlehouse is not positioned to seek sanctions under

Rule 37(b).  As to plaintiff's allegation of spoliation, I find that the record is not sufficiently developed as to the factors necessary to inform the court's decision, and will therefore deny plaintiff's motion without prejudice to renewal at trial, and, if appropriate, will administer a spoliation instruction to the jury at the close of the case.

Based upon the foregoing it is hereby

ORDERED as follows:

(1)     Defendant's motion for summary judgment (Dkt. No. 59) is GRANTED, in part.

(2)     Plaintiff's claim of discrimination based upon a disparate impact theory under the FHA and ADA is hereby DISMISSED.

(3)     Plaintiff's claim of a substantial burden on the free religious exercise rights in violation of the RLUIPA, is DISMISSED.

(4)     Plaintiff's second motion for summary judgment (Dkt. No. 68) is DENIED.

(5)     Pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure and the stipulation of the parties, Counts IV (denial of equal terms under the RLUIPA), Count V (free exercise of religion under the First and Fourteenth Amendments) and Count VI (denial of equal

protection under the Fourteenth Amendment) are hereby dismissed, with prejudice.

(6)     Plaintiff's motion for sanctions (Dkt. No. 64) is DENIED without prejudice to its right to renew that application during the trial in this matter.

(7)     Plaintiff's motion to strike defendant's expert report and to preclude her from testifying at trial (Dkt. No. 66) is GRANTED, in part. Defendant's expert shall be precluded from giving testimony at trial concerning the following topics, as reflected in her expert report :

     a.    "Candlehouse does not meet the sociological criteria for a functional family."

     b.    "There is no solid research evidence to corroborate Candlehouse's claims to effectiveness."

     c.    "Candlehouse does not follow evidence-based protocols for treating individuals with co-occurring disorders."

     d.    "There is no evidence to support that Candlehouse residents are disabled or impaired."

(8)     No costs or attorneys' fees are awarded to any party in connection with the pending motions.

(9)     A final pretrial conference will be held in this matter, by telephone, on May 14, 2013, at 3:00pm.  During that conference, the parties should be prepared to discuss the appropriate timing and location

of the trial in this matter.  Plaintiff's counsel is directed to make

appropriate arrangements for placing the call.

Dated:     May 3, 2013
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge